## WALKER v. WALKER
[No. 124, October Term, 1955.]

*Decided March 16, 1956.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William Pepper Constable* and *John D. Alexander* for the appellant.

*Edward D. E. Rollins,* with whom was *William G. Kemp* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

This appeal is by a husband from a decree granting his wife a divorce *a mensa* on her cross bill in opposition to his bill for the same limited relief. Each bill was based on constructive desertion but the testimony on behalf of each showed, if anything, actual desertion. The cross bill was prompted by the chancellor's refusal to admit testimony as to the wife's claim to a share of the proceeds of the sale, ten years before, of a house owned by the couple.

The parties were married in 1930 and lived in Baltimore until 1944, when after the death of her mother, they sold their house and moved, with their daughter, into the house of her father in Cecil County. The marriage, seemingly, was never a particularly happy one. The wife complained of the husband's selfishness, particularly of his interests and activities, including trips, which she did not share, and of his supposed attentions to other women. Often there were periods when the couple would not speak to each other. The pattern into which the marriage had settled continued, without significant dislocation, until 1954, when the events which gave rise to the litigation before us took place. Three days after Christmas, 1953, there was a quarrel because he had either been unable or unwilling to accompany her on a visit to their daughter, now married. The wife then went without him, and this he resented. The trivial disagreement ended in a joint trip to her lawyer on January 7, 1954. The parties disagree as to who urged whom to visit the lawyer but are agreed that during the consultation, each of them discussed their decision that there be a divorce and that the husband was told by the lawyer, with the apparent agreement of the wife, that he was free to leave if he would

pay her $130.00 a month, approximately one-third of his take home pay. After the visit to the lawyer, the couple, for five days, slept in the same double bed they always used and then, on January 12, the wife left the bed and the bedroom, never to return. The only reason she gave, or has since given, for doing this was that the night before the husband had told her he had cut off her charge accounts and had demanded that she return to him her charga-plates. This she says she took to mean that he no longer wanted her as his wife. From January 12 to March 23, the couple continued to live in the same house, occupying separate bedrooms. Relations deteriorated not only between them but also between the husband and the father-in-law and the brother-in-law. On March 20, the husband was given until April 1 to decide whether he would pay $50.00 a month rent and $10.00 a week board to his father-in-law, although he was then giving his wife $130.00 a month. Suddenly, on March 23, the father-in-law summarily ordered the husband from the house that very night. At this point the husband and wife each called a neighbor to hear the father-in-law repeat his demand that the husband immediately get out of the house. The wife remained with her father and the husband went to live in Washington, a place of residence convenient to his work as a railroad passenger conductor on the Washington to New York run. The husband testified, with corroboration, that he asked his wife to return to the bedroom on three occasions. She admits these invitations but denies their genuineness. There was testimony, also with corroboration, that on the night he was ordered from the house the husband invited the wife to come with him to Washington, and that he repeated his invitation on several other occasions, saying that he would establish a suitable apartment for her. The wife refused to go unless the husband met certain conditions said to have been laid down by her lawyer, two of which were to give evidence, satisfactory to the wife and the lawyer, of his genuine desire for a reconciliation and of

his real willingness and intention to pay her a certain amount of money a month.

The chancellor said: "I think that the testimony taken on the whole establishes the fact that the plaintiff, Walker, intended sometime after the 7th of January and the 23rd of March to terminate the marriage relationship, and he left. This situation had built up over a number of years. The fact that he did leave under pressure of Mr. Pennock * * * is not, in my judgment, the determining factor of the case. * * * He is the one who physically left."

We think that the conclusion of the chancellor that the husband did not desire the continuation of the marriage is right, but that he did not go far enough and failed to take into account the fact, clearly revealed by testimony, that the wife was at least equally desirous of terminating the marriage, if this could be done without financial detriment to her. The picture presented by the record is that of a couple who had reached the point where both were satisfied, if not anxious, to end their marriage. Once this mutual admission was made on January 7, their subsequent actions were mere jockeying for legal position, the wife trying not to prejudice her right to maximum financial support, and the husband trying to do away with his obligation to support or at least keep it at a minimum. It is significant that the husband's offers of reconciliation were always made in the presence of witnesses, complete strangers to the wife, who had never visited the home before, and who seemingly were brought home simply to hear the offers made. We conclude from all the testimony that the husband did not intend the marriage to continue and that his offers to establish a home in Washington were neither intended nor expected to be accepted. This being so, they give him no support in his role as a deserted spouse. *Givner v. Givner*, 201 Md. 333.

The wife was equally at fault. She left the marital bed without justification, she stood by without protest, if indeed she did not acquiesce, when her husband was ordered from their home by her father and she refused to renew conjugal relations or make a new home with her

husband, except on legally unwarranted qualifications and conditions that, in turn, deprive her of the right to claim to be a deserted wife. *Diamond v. Diamond,* 182 Md. 103.

True in this case is what was said in *Blair v. Blair,* 199 Md. 9, 15: "We are not unmindful of our long consistent rule that where the chancellor has seen and heard the parties, we will not disturb his findings of fact unless they are clearly erroneous, but in this case, it is not a question of fact but a question of intention to be derived from established facts."

The principles of law which have been developed as to desertion, actual and constructive, and mutual fault, were fully and clearly restated by Judge Delaplaine for the Court in *Mower v. Mower,* 209 Md. 413, a case not essentially dissimilar from this one. There is no occasion to repeat them here. Suffice it to say that we find both parties at fault so that neither is entitled to divorce. Both bills should have been dismissed, and the decree appealed from must be reversed.

> *Decree reversed and case remanded for passage of an order dismissing the original bill and the cross bill; appellant to pay the costs.*